## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARY ELLEN CURTO )
35575 1800 M Street, NW )
Washington, DC 20033 )
 )
    Plaintiff, )
 )
vs. )
 )
THE CORPORATION FOR )
TRAVEL PROMOTION d/b/a )
BRAND USA )
1725 Eye Street NW, Eighth )
Floor )
Washington, DC 20006 )
 )
Serve: Corporation Service Co. )
1090 Vermont Avenue, NW )
Washington, DC 20005 )
 )
 )
 )
    Defendant. )
 )
_____ )

Civil Action No.

_____

DEMAND FOR JURY TRIAL

### COMPLAINT

Plaintiff, Mary Ellen Curto, by and through undersigned counsel, brings this action

against the Corporation for Travel Promotion, d/b/a Brand USA (hereafter, "BUSA" or the

"Corporation") and alleges as follows:

### I.      INTRODUCTION

1.      BUSA terminated Plaintiff Mary Ellen Curto on October 3, 2013 (1) because she

took acts in furtherance of a qui tam suit, and because she made other efforts to stop violations of

1

the False Claims Act, in violation of the anti-retaliation provision of the FCA, 31 U.S.C.A. § 3730(h), as amended by the Fraud Enforcement and Recovery Act of 2009 (FERA), Pub. L.No. 111-21; and (2) and as wrongful termination in violation of public policy.

2.     Ms. Curto attempted to correct and report BUSA's repeated violations of Federal contracting and procurement requirements, specifically BUSA's engaging in kickback schemes with private-partner entities and submitting inflated valuations of in-kind donations to justify and obtain Federal matching funds from the United States government.

3.     Ms. Curto was subjected to harassment as a result of her attempts to correct and report these violations, and was ultimately terminated by BUSA on October 3, 2013.

4.     Ms. Curto warned BUSA management and members of the Board of Directors that its failure to correct the false reports constituted fraudulent conduct.

5.     Ms. Curto reasonably believed that BUSA's knowing failure to disclose the kickback scheme and its violations of Federal procurement policies constituted a false statement material to a false or fraudulent claim.

6.     BUSA fired Ms. Curto because of her protected conduct under the FCA.

7.     BUSA fired Ms. Curto because she refused to engage in illegal conduct by providing false information to the Federal government.

## II.     PARTIES

8.     Plaintiff, Mary Ellen Curto ("Plaintiff" or "Ms. Curto"), is the former Vice President of Operations at BUSA, and is a citizen and resident of the District of Columbia.

9.     Defendant BUSA is headquartered at 1725 Eye Street, NW, Washington, DC 20006. BUSA is a non-profit corporation organized under the laws of the District of Columbia.

2

### III.    JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this complaint pursuant to

28 U.S.C. §§ 1331 and 1345, because this is an action arising under the laws of the United

States, specifically, the False Claims Act, 31 U.S.C. §3730(h).

11.     Venue in the District of Columbia is appropriate pursuant to 28 U.S.C. § 1391 in

that, at all times material to this civil action, Defendant transacted business in the District of

Columbia or submitted or caused the submission of false claims in the District of Columbia to

the United States.

12.     This Court also has supplemental jurisdiction over the pendent wrongful

termination claim under Washington, DC, common law.

### IV.    FACTUAL ALLEGATIONS

13.     BUSA hired Ms. Curto as its Vice President of Operations in October 2012.

14.     As Vice President of Operations, Ms. Curto was charged with developing and

implementing the operational infrastructure required to support the Corporation's mission. At the

time she joined the Corporation, it had no centralized accounting or financial reporting systems,

no centralized information databases or information network, and marginal operational

procedures or processes in place. Departments relied on separate, manual Excel spreadsheets.

Financial information was not consolidated into a centralized system, and the corporate

accounting department did not know the Corporation's liabilities.

15.     BUSA is a public-private partnership established by the Travel Promotion Act of

2009 ("TPA") with the mission of increasing international tourism to the United States. The TPA

was enacted on March 4, 2010, as Section 9 of the "United States Capitol Police Administrative

Technical Corrections Act of 2009" (Pub. L. 111-145). The TPA establishes the Corporation for

Travel Promotion, or CTP, as a non-profit corporation under the laws of the District of Columbia. (See, Title 22, United States Code, Section 2131, et seq.).

16.     Under the TPA, the goal and purpose of BUSA is to solicit donations – either cash or in-kind (i.e., goods and services) – from private-entity partners for the purpose of promoting travel and tourism into the United States.

17.     As originally contemplated, BUSA would solicit donations from a wide variety of private-entity partners in the travel and hospitality industry. These would include large hotel chains such as Marriott International, Inc. or Hilton Inc.; travel carriers such as British Airways or United Airlines; travel booking websites like Expedia or Orbitz; and state-level travel promotion agencies including Visit California, Visit Florida, or NYC & Company.  These state-level agencies are similar in concept to BUSA except that they are dedicated to developing the travel industry in their own states, and not the United States as a whole. To some extent by statutory design and basic industry synergies, many of the executives and leaders of these private-entity partners or state-level agencies are also BUSA Board members. For example, former Board Chair and current Board member Caroline Beteta, is also the president and CEO of Visit California. Board Treasurer Arne Sorenson is president and CEO of Marriott, and Board member George Ferttita is the CEO of NYC & Company.

18.     As part of her duties and responsibilities, Ms. Curto assembled a team that developed basic financial policies and procedures, including a Cash Management Program, Travel and Expenses Policy and Procedures, Procurement Policies and Procedures, and a Treasury and Investment Policy. The finance team assembled the entire previous year's financial information in order to prepare for a financial audit in February 2013; developed a detailed $200 million operating budget for the upcoming year with the assistance of Michael Carroll, Vice

4

President of Advertising; and advised Board Chair Caroline Beteta, and Arne Sorenson, Treasurer of the Board of Directors, on financial issues in preparation for Board meetings.

19.     Despite Ms. Curto's best efforts to engender a culture of compliance and accountability at BUSA, BUSA Chief Executive Officer Chris Thompson and some members of the Board of Directors remained determined to circumvent government oversight and run the Corporation for their own personal gain.

**BUSA, as a Recipient of Federal Funds, Must Follow Stringent Reporting Requirements on its Funding Sources**

20.     The TPA authorizes the Secretary of Commerce to appoint an 11-member Board of Directors who will serve as incorporators and take the steps necessary to establish the Corporation for Travel Promotion, or BUSA. Under the TPA, BUSA is not considered a Federal entity, and no Board member is considered a Federal employee by virtue of his or her service on the Board. (See, 22 U.S.C. 2131 (b)(2)(G)).

21.     The TPA requires the Corporation to establish policies and procedures for auditing compliance which conform to generally accepted accounting principles. The Act expressly provides that the Corporation must engage an "independent firm to conduct an annual financial audit of the Corporation's operations and shall publish the results of the audit." See 22 U.S.C. § 2131(b).

22.     BUSA receives Federal matching funding from Federal agencies.

23.     In order to receive Federal matching funds, BUSA must submit documentation of the donations it receives to both the Department of Commerce and the Department of Treasury. For cash contributions, BUSA submits a letter of agreement with the contributing partner and a bank statement or documentation of a wire transfer. For in-kind contributions, BUSA is credited

5

with the fair-market value of the contributions that it documents and certifies to the government for release of matching dollars from the ESTA fund.

24.     The funding provided to BUSA originates from visa application fees collected under section 217(h)(3)(B)(i)(l) of the Immigration and Nationality Act.  The TPA requires the Secretary of DHS to assess and collect a fee on travelers from visa waiver program countries under the Electronic System of Travel Authorization (ESTA). (See, Title 8, United States Code, Section 1187(h)(3)(B)(i)(1), et seq.). The required initial ESTA fee includes a "$10 per travel authorization" and the amounts collected for this travel fee must be transferred to the Travel Promotion Fund at the Treasury Department. (See, 8 U.S.C. Section 1187 (h)(3)(B)(ii)). Once credited in the Travel Promotion Fund, these amounts are made available to BUSA. (See, 22 U.S.C. Section 2131(d)).

25.     BUSA is subject to stringent reporting requirements to the government in order to receive its matching Federal funds.

26.     The government only pays matching funds to BUSA upon submission of an ESTA certification by BUSA, which is personally signed and certified by its CEO. These ESTA submissions, pursuant to the TPA, are also reviewed and certified by BDO, the independent accounting firm hired by BUSA to review its submissions to the government. BUSA numbered its ESTA submissions in this format "Total ESTA xx".  For fiscal year 2013 (as of September 19, 2013), the government had paid to BUSA over $28 million, and was still owed an outstanding amount of approximately $70 million.

27.     The TPA also provides BUSA authority to assess members of the international travel industry.  (See, 22 U.S.C. Sections 2131 (f)(1) and (2)). In 2011, BUSA was required to provide matching amounts from industry assessments equal to 50 percent or more of the amount

transferred to the Fund.  (See, 22 U.S.C. Section 2131 (d)(3)(A)(i)).  For Fiscal Years 2012

through 2015, BUSA will receive funds equal to the amount collected from industry assessments,

not to exceed $100 million. (See, 22 U.S.C. Sections 2131(d)(3)(A)(ii) and (d)(2)(B)). After the

Act sunsets in 2015, funding for BUSA will be provided only through industry assessments.

28.     The TPA establishes specific accountability measures and detailed reporting

requirements for BUSA.  These requirements must be satisfied by BUSA in order for it to

receive Federal matching funds under the TPA. (See, 22 U.S.C. 2131 (d)).  For example, the TPA

requires BUSA to "establish annual objectives" and "establish a marketing plan" for submission

to the Secretary of Commerce.  (See, 22 U.S.C. 2131 (c)(1)).

29.     BUSA also must submit an annual report to the Secretary of Commerce for

transmittal to Congress. This report must include: (i) a detailed inventory of the amounts

obligated or expended by the Corporation for the year; (ii) a detailed description of each in-kind

contribution, its fair market value, the individuals or organization responsible for the

contribution, its specific use, and a justifications for its use within the context of the

Corporation's mission; (iii) an objective and quantifiable measurement of the Corporation's

progress in meeting the objectives of the Board; (iv) an explanation of the reason for any failure

to achieve an objective established by the Board; and (v) a comprehensive and detailed report of

the Corporation's operations and activities to promote tourism in rural and urban areas. (See, 22

U.S.C. 2131 (c)). This report is signed by the Chair of the Board and the CEO of BUSA, and it is

also audited by BUSA's outside independent auditors.

30.     Following its incorporation, the Departments of Commerce and Treasury signed a

Memorandum of Understanding with BUSA that outlines the roles and responsibilities for the

Federal departments and the Corporation with respect to the Travel Promotion Act and the

associated Travel Promotion Fund. (See, Memorandum of Understanding Among the U.S. Department of the Treasury, the U.S. Department of Commerce, and the Corporation for Travel Promotion ("MOU")). The MOU establishes additional oversight and reporting structures for BUSA.

31.     For initial expenses and activities, the MOU requires BUSA to provide the Departments of Treasury and Commerce with an accounting of the amounts BUSA has incurred, or expects to incur, and the purpose for each expenditure. For Fiscal Years 2012 through 2015, when the Corporation receives assessment fees from industry members, the MOU requires the Corporation to provide the Departments of Treasury and Commerce "an accounting, certified by an officer of the Corporation and by an independent certified public accounting firm, of the amounts received by the Corporation from non-Federal sources, including money and the fair market value of goods and services contributed to Corporation. Specifically, as set forth in the MOU, BUSA must do the following in order to receive matching Federal funds under the terms of the TPA:

- Submit to the Treasury and Commerce a request for payment (via the ESTA form), including any "associated documentation"; and

- Provide an accounting "certified by an officer of the Corporation [or BUSA] and by an independent certified public accounting firm" of any amounts received from private donors or contributors, "including money and the fair market value of goods and services."

32.     BUSA's leadership did not understand the foundational concepts that governed BUSA's receipt of Federal funds.

33.     BUSA failed to grasp that BUSA's receipt of Federal funds was contingent upon open and transparent disclosure to the Federal government through the ESTA certification process.

34.     While BUSA was required to request donor contributions and receive complementary Federal funding and direct its own spending, BUSA would reimburse donors for their donations, provide additional Federal funds and allow the private-entity donors to direct the spending.

**BUSA's Kickback Scheme and Improper Valuations of In-Kind Donations**

35.     The marketing and solicitation of cash contributions from private-entity partners for BUSA always focused on how BUSA could use some of the resulting Federal matching funds to enhance the private-entity partner's contribution. BUSA needed cash donations to receive Federal matching funds under the TPA. Without those matching funds, BUSA would cease to operate.

36.     In order to encourage private-entity partners to donate cash, BUSA agreed to enter into what became known as a "Marketing Partnership Agreement" or "MPA" with these private-entity partners. Under this arrangement, private-entity partners would sign an MPA, which stated that they were contributing (non-tax deductible) funds to BUSA to be used in pursuit of the BUSA mission to increase international visitation to the USA.

37.     These Marketing Partnership Agreements were essentially a kickback scheme, whereby BUSA would raise money with the promise that travel-industry donors would receive large amounts of advertising paid by Federal funds. These Marketing Partnership Agreements obligated BUSA to match at a specified percentage whatever was donated by the private-entity partner.  Sometimes this match by BUSA was as much as 100%, but typically it was 30%.

Additionally, under the terms of the Marketing Partnership Agreement, the private-entity partners directed the spending of their donation along with the funds from BUSA's percentage match. A private-entity partner could and did direct BUSA to spend that entire sum specifically to benefit that partner. Allowing the private-entity partners to direct BUSA's spending violated the TPA.

38.     As part of the Marketing Partnership Agreement, BUSA was typically required to use the private-entity partner's chosen advertising and media agency, instead of BUSA's own agency, which had been selected and hired based on an open Request for Proposal process. Effectively, the Marketing Partnership Agreement allowed a private-entity partner to carve out a portion of its existing media budget plan for BUSA , and ultimately the government, to subsidize to a factor of at least 130%.

39.     These Marketing Partnership Agreements and similar arrangements violated the TPA and other Federal requirements. See C.F.R. § 215.23(3) & (4)("All contributions, including cash and third-party in-kind, shall be accepted as part of the recipient's cost sharing or matching when such contributions...[a]re necessary and reasonable for proper and efficient accomplishment of project or program objectives[] [and] are allowable under applicable cost principles."). BUSA has incorporated these requirements embodied in C.F.R. § 215.23(3) & (4) into its own internal policies.

40.     The Marketing Partnership agreements could also have jeopardized BUSA's status as a 501(c)(6) tax exempt entity. To the extent that BUSA executes the directives of its private, for-profit partners, it acts outside the scope of a 501(c)(6) corporation.

41.     As these Marketing Partnership Agreements became more prevalent, the private-entity partners demanded execution of the MPA before they would agree to "donate" any cash to BUSA. BUSA never disclosed this precondition-to-donation facet of its operations when

10

reporting and submitting its ESTA forms for Federal matching.

42.     BUSA had a *quid pro quo* marketing arrangement with Visit California, the official State tourism board for California. Visit California was the largest cash contributor to BUSA in 2012. It had contributed about $5 million.  As part of the contribution, BUSA entered into an MPA with Visit California, which required BUSA to spend the donated funds of $5 million (plus a 30% match by BUSA of approximately $1.5 million) on Visit California's existing advertising campaign and to use Visit California's primary ad agency, Mering Carson. Despite BUSA's promise to use Mering's advertising services, Mering and BUSA had no written contract identifying their respective duties and obligations.

43.     Another example of a *quid pro quo* transaction is with Visit Florida, the official State tourism board for Florida, and another large contributor to BUSA. During several conference calls with Visit Florida personnel, BUSA was required to explain and document how all of the Visit Florida "donated" funds had been spent. During one call, Donald Richardson, the CFO of BUSA, and Amir Eylon, the former Vice-President of Partner Services at BUSA, along with several other BUSA staff members, were discussing the BUSA 30% match under the Marketing Partnership Agrement with Visit Florida. Mr. Eylon flatly stated that BUSA would "absolutely" continue to contribute 30% of its own matching funds to supplement the Visit Florida donations. This statement was made after several consecutive weekly BUSA senior staff meetings where it was explained that BUSA should not be commenting about or committing to direct "matching" funds and similar support for partner contributions. Mr. Richardson remained silent and never contradicted what Mr. Eylon said about the "absolute" 30% match. For the budget planning process for BUSA's fiscal year 2014, BUSA continued to budget a 30% supplement for both domestic and international partners and simply earmarked and folded these

11

funds under "Functional Expenses" in its balance sheets.

44.    Ms. Curto was responsible for working with auditors during her employment at BUSA. During the FY 2012 audit, BUSA's auditors, Moss-Adams, asked Ms. Curto for documents referencing the 30% match. Ms. Curto in turn asked In-House Counsel Jake Conte, the staff expert on the valuation process for the documentation, who yelled at her in response, "You can't say that out loud!," and explained that it was in violation of the TPA and discussed only internally.

45.    In October 2012, BUSA Board Chair Ms. Beteta hired Moss-Adams to serve as BUSA's auditor. Moss-Adams, however, was also the auditor for Visit California. This raised questions as to the independence of the Chair's choice of accounting firms. This independence would be further questioned when Moss-Adams issued its final Management letter stating that BUSA had an "unqualified audit."

46.    Ms. Curto and others at BUSA were surprised that BUSA would receive an unqualified audit when BUSA had no consolidated financial statements, no accounting procedures or policies in place and a number of other accounting deficiencies on September 2012 at the completion of the Fiscal Year.

47.    In their 2012 draft entitled "Communication of Internal Control Related Matters" Moss-Adams raised concerns about these *quid pro quo* transactions. Moss-Adams raised concerns about whether the 30% match was being properly reflected in BUSA's accounting. To that end, Moss-Adams recommended that BUSA establish formal guidelines for the positions taken with the implied 30% match, but BUSA never adopted those recommendations and the comment is missing from the final Financial Statement or Management Letter.

48.    In June 2012, while acting as CEO of BUSA, Ms. Beteta hired KTS Business

Services as BUSA's compliance and internal control auditor. KTS is also Visit California's

compliance firm and has no Federal compliance experience and/or Federal compliance clients. In

its April 2013 compliance assessment, KTS determined that there were accounting problems at

BUSA, as the 30% match was not accurately reflected in BUSA's accounting procedures. On

May 5, 2013, Ms. Curto submitted a response to KTS's report where she outlined the accounting

problems associated with the kickbacks resulting in a 30% match to the donor entity. She brought

these issues to the attention of Matt Sabatini, Vice President of Operations for Visit California

and Caroline Beta, president of Visit California and Board Chair Caroline Beta, stating that

the match was a violation of the TPA.

49.     In 2013, BUSA used the *quid pro quo* transactions with international advertising

firms and categorized these expenses as "Functional Expenses" in its accounting. BUSA would

give one-third of its Federal funding contribution match to these international advertising

agencies in order to encourage their participation.  In FY2013 BUSA had used Federal funds to

encourage the participation of companies, such as STA Travel, Virgin Holidays, BS Fuji, Orbitz

Worldwide, Guardian, Trip Advisor and Travel Zoo. This caused several million dollars to be

given to these international firms. The Marketing Partnership Agreement between BUSA and

these companies was approved by BUSA Board members David Lim and George Ferttita, as

well as by BUSA Marketing Vice President Jay Gray. The Marketing Partnership Agreement,

like all BUSA agreements, were signed by CEO Chris Thompson.

50.     Certain publishers used by BUSA, including Phoenix Publishing Group, would

donate additional advertising space. In these instances, BUSA not only offers the standard 30%

kickback, but also awards additional Federal dollars to the partner's project to reflect the

donation of space made by the publisher.

13

51.     BUSA did not identify the kickback promises when it requested matching funds from the Federal government. BUSA submitted false reports, as evidenced by the ESTA submissions, to the United States for payment and receipt of Federal matching funds under the TPA and the MOU, and in doing so violated the False Claims Act.

52.     Pursuant to the Trade Promotion Act, BUSA is responsible for submitting an annual report to the Department of Commerce that includes a detailed description of each in-kind contribution, its fair market value, the individual or organization responsible for contributing, its specific use, and a justification for its use within the context of the Corporation's mission. 22 U.S.C. § 2131 (c)(3)(C).

53.     Federal matching funds "may not be used for any purpose inconsistent with carrying out the objectives, budget and report" developed by BUSA. 22 U.S.C. § 2131 (c)(4). Although partners are permitted to make recommendations about the use of their donations, or, if consistent with BUSA's objectives, to enter into parallel campaigns with the Corporation, BUSA and its Board must retain full control over the direction of Corporation operations and activities to ensure they are in keeping with the overall mission and goals of BUSA as described by the Act.

54.     BUSA never disclosed this MPA precondition-to-donation facet of its operations when reporting and submitting its forms for Federal matching. BUSA was leveraging money from its operating and marketing budgets to create a facade of lush cash donations, and then submitting false forms to the government to receive matching Federal funds to keep itself operating as an ongoing concern. BUSA was using current budget funds to improperly generate future revenue funding.

55.     These marketing partnership arrangements were not limited to just cash. BUSA

14

also used these collateral, undisclosed arrangements with in-kind contributions. In-kind contributions usually consisted of goods and services, such as digital images or a website domain. For in-kind contributions, BUSA also used a Marketing Partnership Agreement. As with the agreements for cash donations, the problem with these was that BUSA was required to make cash payments, or buy items, to the private-entity partners before ever receiving the in-kind donation. It was essentially, a *quid pro quo* or pay-to-play arrangement.

56.     In an effort to increase its matching funds, BUSA and its Board members and officers intentionally and knowingly exaggerated the in-kind donations of donors.

57.     There were other examples of abuse by BUSA using these *quid pro quo* marketing arrangements. In 2013, IMAX "donated" digital images valued at $30 million to BUSA that required BUSA to purchase two IMAX movies for $12 million each.

58.     The $30 million valuation of the photos from IMAX was initially rejected by the Department of Commerce when BUSA submitted it for approval and matching funds because the valuation of the photos was done in-house by IMAX itself. When the images were first appraised by an outside source, J. Walter Thompson, an internationally-respected marketing firm, the appraiser stated that they were only worth $1 million at most.

59.     Needing a higher valuation in order to meet its statutorily-mandated fundraising goal, BUSA In House Counsel Jake Conte scoured the country for a more flexible appraiser. After speaking with numerous appraisers, BUSA was able to find a used bookseller in California willing to appraise the images at $30 million. BUSA resubmitted the donation and, in effect, received $30 million from the Treasury as a result of the overvaluation.

60.     The Trade Promotion Act states: "For the purpose of determining the amount received from non-Federal sources by the Corporation, other than money – (I) the fair market

value of goods and services (including advertising) contributed to the Corporation..." 22 U.S.C §
2131 (d)(3)(B).

61.     The fraudulent nature of the IMAX valuations and certification to the government
violated § 2131 (d)(3)(B) of the Trade Promotion Act. The Corporation reached its fundraising
goal by overvaluing in-kind donations like the IMAX valuations.

62.     NYC & Company CEO George Ferttita is a member of BUSA's Board of
Directors. In 2013, NYC & Company "donated" $10 million in digital images of New York City
in return for BUSA's agreement to pay $240,000 for NYC & Company's booths at international
trade shows. This kind of *quid pro quo* transaction was not disclosed to the Federal government
through the ESTA certification process, and it was a violation of the TPA.

63.     In the case of NYC & Company, the Board held two executive sessions with Mr.
Ferttita to examine the deals but ultimately approved them.

64.     These Marketing Partnership Agreements, including those with Visit California
and Visit Florida, were all approved, ratified or certified by the Officer Defendants and the Board
Defendants. And the related ESTA certifications submitted by BUSA to the government for
matching Federal funds were likewise approved or certified by the Officers of BUSA, including
BUSA CEO Chris Thompson.

65.     The Board of Directors intentionally and knowingly violated the Travel
Promotion Act by authorizing *quid pro quo* transactions for donations by corporations, resulting
in guaranteed direct Federal funds to the donor corporations. These and other similar
arrangements violate the False Claims Act, and other Federal requirements including those found
in the TPA.

66.     The Marketing Partnership Agreements for cash or in-kind contributions clearly

16

obligate BUSA to direct the donated funds (including a percentage match by BUSA) for the sole purpose of promoting the private-entity donor's brand and marketing image when, in fact, BUSA's mission is to use these donated funds (either cash or in-kind contributions) to promote the United States to international travelers. BUSA executives engaged in this scheme for their own benefit, to remain on the BUSA payroll, and to maintain their high-ranking executive positions within a high-profile travel-related entity. The Board conspired and engaged in this scheme for their own self-interest and benefit – a dollar donated to BUSA meant at least a $1.30 in return for their own organization.

**BUSA's Non-Compliant Procurement Practices**

67.     BUSA is doing business with companies without a competitive bid process and without agreement on budgets, scope or other terms of the arrangements that are not reflected in the Corporation's accounting records. As a result, when BUSA reports to Congress and Federal agencies every year, it violates the Act's requirement that it submit "a comprehensive and detailed report of the Corporation's operations, activities, [and] financial condition." 22 U.S.C. § 2131(c)(3). The reports leave unclear what services BUSA is receiving, from whom, and whether it is paying a reasonable price for such services.

68.     From January through August of 2013, Ms. Curto, Mr. Carroll, Jay Fridkis, BUSA's Director of Information Technology and Karen Echeverri, Ms. Curto's Executive Assistant, reported many instances of improper conduct, the most egregious activities of which they identified fell into two categories: (1) fraud and/or abuse in connection with the obtaining and use of government matching funds, including a kickback scheme with partner entities and the submission of inflated valuations of in-kind donations to justify matching funds; and  (2) non-compliance with contract procurement policies and regulations, including violations of

conflict-of-interest rules.

69.     When Ms. Curto was hired, she realized that BUSA was not compliant with Federal hiring and procurement requirements.

70.     In January 2013, Representative Bennie Thompson's Chief Counsel, Cherie Dixon, requested a meeting with BUSA's Government Relations team and Ms. Curto to express the Congressman's concerns that BUSA was not hiring minorities and did not appear to be complying with Federal hiring and procurement regulations generally. Ms. Curto and BUSA's Government Relations team, which included Michael Fullerton and Aaron Wooden-Schwartz, met with Ms. Dixon. Ms. Curto was quick to reassure Ms. Dixon that BUSA would be complying with all such regulations and was in the process of hiring Human Capital Management to oversee these functions.

71.     Shortly after this meeting, Ms. Curto, Mr. Fullerton and Mr. Wooden-Schwartz emphasized to CEO Chris Thompson the urgent need to follow Federal hiring and procurement regulations. Despite this meeting, Mr. Thompson's hiring practices were not compliant with Federal hiring and procurement guidelines, to wit: Mr. Thompson hired a friend of his, Tom Garzilli, as Senior Vice President of Partnership Programs without posting the job opening, and then directed Ms. Curto to post the opening on February 13, 2013, after he had already offered Mr. Garzilli the job. Less than two weeks later, Mr. Thompson hired Alfredo Gonzales as Senior Vice President of Global Services, again having Ms. Curto post the position after Mr. Thompson had already offered Mr. Gonzales the position and Mr. Gonzales had accepted the position.

72.     After Ms. Curto's meeting with Mr. Thompson regarding Representative Thompson's concerns, Board member Daniel Halpern hired K&L Gates Partner William Kirk, who had personal and professional affiliations with Representative Thompson to address

18

Representative Thompson's concerns about Mr. Thompson's hiring practices. As a result, Mr. Thompson instructed Ms. Curto to award a legal services contract for assistance with EEOC compliance to K&L Gates as a "thank you" for Mr. Kirk's assistance in encouraging Representative Thompson to cease inquiries into BUSA's hiring practices.

73.     Mr. Thompson awarded other contracts based on personal allegiances. For example, in February of 2013, the Board advised Mr. Thompson that it wanted an executive search firm to assist in locating and hiring a Chief Management Officer. Mr. Thompson promptly told Ms. Curto that he intended to use a company called SearchWide because he had previously worked with SearchWide CEO Mike Gamble. He instructed Ms. Curto to post a request for proposal by executive search firms on BUSA's site, but told her he planned to sign an agreement with SearchWide after the request for proposals had been posted for three days, which he ultimately did.

74.     On May 14, 2013, Ms. Curto also reported to Chief Financial Officer Don Richardson that Mr. Thompson was planning to award a contract, the Latin America GSA contract, to a woman with whom he had a sexual relationship, in violation of Federal regulations and internal policies prohibiting conflicts of interest in the awarding of such contracts.

75.     On May 15, 2013, Ms. Curto reported what she had heard to Mr. Richardson and insisted that the Corporation could not proceed with an award unless valid procurement documentation was in place. Ms. Beteta ultimately stepped in and informed Mr. Thompson that the Board and the industry were aware of the situation, and formally instructed him not to award the contract to the woman having a relationship Mr. Thompson.

76.     In its April 2013 compliance assessment, BUSA's auditors, KTS, had identified numerous deficiencies with BUSA's procurement practices. KTS reported that the Corporation

did not properly track its contractors and vendors and it may not know their identities; that the Corporation regularly had vendors begin work without authorized contracts and perform work outside of budget and scope, making it difficult to detect overpayments and that third-party and subcontractor arrangements were not reflected in BUSA's contracts with its partners, again making it impossible to determine whether a request for payment should be approved and undermining any avenue of recourse in the event of a third-party failure to perform.

**Ms. Curto's Reporting and BUSA's Retaliatory Actions Against Ms. Curto**

77.     Increasingly concerned about Mr. Thompson's inappropriate actions and directives, Ms. Curto began, in early 2013, to document Mr. Thompson's questionable activities and report them to Matt Sabatini, Advisor to the Chair, who in turn reported them to Ms. Beteta. Both urged Ms. Curto to continue documenting and reporting Mr. Thompson's misconduct. This continued for several months, during which time Mr. Carroll, Mr. Fridkis and Ms. Echeverri, also met with Mr. Sabatini to report Mr. Thompson's fraudulent use of Federal funds and improper procurement practices.

78.     In or about May of 2013, Chairwoman Beteta became very concerned about the fraudulent nature of BUSA operations. Chairwoman Beteta hired an outside auditor to complete a Compliance Report of BUSA's procedures. Ms. Curto was informed that she was no longer reporting to the President but to Ms. Beteta, thus reporting to a party outside her usual chain of command. On May 24, 2013, nine days after Ms. Curto met with Mr. Richardson, Mr. Thompson summoned her to his office and falsely accused her of improperly procuring a contract for office supplies, which had been secured properly five months earlier.

79.     Five days later, on May 29, 2013, Mr. Richardson called Ms. Curto into his office and accused her of "fixing" the office supplies contract. Ms. Curto showed him the

documentation related to the contract, and Mr. Richardson at first claimed that the paperwork was improper.

80.     Mr. Richardson then abruptly abandoned this argument and began accusing Ms. Curto of violating the Corporation's whistleblower policy. He claimed that Ms. Curto had violated the policy by reporting to him as CFO rather than to Audit Committee Chairman Tom Klein. Ms. Curto explained that she had reported the matter to the CFO because he would have more information than Mr. Klein about the procurement documentation, and she further pointed out that the Corporation ultimately lacked a clear whistleblower policy.

81.     The following day, Mr. Richardson called Ms. Curto into his office and said that the Latin America GSA contract matter had been "resolved," a new procurement was in place, and the investigation into the office supplies procurement was closed.

82.     In or about June of 2013, Ms. Curto discovered documents that were marketing plans related to BUSA and its private-entity partners that demonstrated a misuse of BUSA funds, whereby requests for Federal funds would be based on fraudulently calculated contributions and those contributions and Federal funds would be specifically directed by the private-entity partners rather than BUSA. Ms. Curto and others reported the impropriety of these arrangements with BUSA leadership, including Ms. Beteta.

83.     On June 10, 2013, in response to Mr. Thompson and Mr. Richard's false accusations, Ms. Curto filed a complaint with Maureen Miller, Human Capital Services Director, documenting their retaliation for her attempts to address Mr. Thompson's violation of procedures with respect to the Latin America GSA contract. Following her complaint to Ms. Miller, Ms. Curto continued to speak with Mr. Sabatini, who relayed information to Ms. Beteta, regarding Mr. Thompson's misconduct.

84.     In June of 2013, Ms. Beteta warned Ms. Curto that her anonymity in connection with the Board's  investigations of the Latin America GSA contract and of Mr. Thompson had been compromised. Ms. Beteta said Mr. Thompson had told her that he knew who the whistleblowers were, that Ms. Curto and Mr. Carroll were among them, and that he intended to fire Ms. Curto for her role in investigating and documenting his wrongdoing. Given Mr. Thompson's stated plan, Ms. Beteta advised Ms. Curto to file a formal whistleblower complaint with the Audit Committee, in part hoping that this would help to protect her against termination.

85.     In late June of 2013, Ms. Curto sent an e-mail to BUSA's Chief Financial Officer stating that she would no longer be willing to sign any documents that she deemed non-compliant, including, *inter alia* invoices, purchase orders, contracts and marketing plans. She also took herself out of the ESTA submission process.

86.     When Mr. Thompson learned that Ms. Curto had reported his actions, and the Board of Directors was aware of his actions, he launched a campaign of retaliation against Ms. Curto that would soon result in her termination.

87.     Because of Mr. Thompson's response, Ms. Curto began reporting directly to BUSA Board of Directors Chairwoman Caroline Beteta.

88.     At Ms. Beteta's  suggestion, Ms. Curto telephoned Mr. Klein on or around June 15, 2013, to report to the Audit Committee the fraudulent and otherwise non-compliant conduct described herein, in particular Mr. Thompson's improper award of contracts and executive-level positions to personal friends. Mr. Klein ended the conversation assuring Ms. Curto that the Board would follow up and conduct a full and independent investigation into the matter. Mr. Carroll also telephoned Mr. Klein to lodge a formal report and also heard these assurances. Ms. Curto believed Mr. Klein, based both on their conversation and on the fact that she was hearing from

some Board members, including Ms. Beteta and Mr. Halpern, that the Board would investigate.

89.   In taking these actions, Ms. Curto acted in furtherance of a possible *qui tam* suit and she made efforts to stop violations of the False Claims Act.

90.   Ms. Curto's continued opposition caused tension between Curto and BUSA's managers and officers and members of the Board of Directors.

91.   After her formal complaint and her conversation with Mr. Klein, Ms. Curto noticed a shift in management's treatment of her. Mr. Sabatini told her that he could no longer speak to her directly.

92.   After Ms. Curto's complaints to Mr. Klein, Vice President of Partnership Programs Karyn Gruenberg and Mr. Garzilli began bypassing Ms. Curto and going directly to Mr. Richardson with Letters of Agreement with partners that she would have previously reviewed, and Mr. Conte began reporting directly to Mr. Richardson rather than to her.

93.   Ms. Curto was excluded from meetings, and walked in on meetings where Mr. Richardson was meeting directly with her staff without her.

94.   Distressed by BUSA's failure to protect her against retaliation, Ms. Curto took two days of medical leave on August 1, 2013, and sought medical treatment for the severe anxiety that the Corporation's actions were causing her.

95.   On August 7, 2013, shortly after Ms. Curto's return from medical leave, Mr. Klein wrote her stating that while the alleged conduct she had reported "does not reflect the practices we expect at BUSA," it did not appear to be "actionable."

96.   When Ms. Curto responded on August 12, 2013, that she still needed to raise a number of outstanding concerns, Mr. Klein directed her to speak with lawyers from Katten Muchin, which the Corporation had retained to investigate her allegations.

97.     On August 13, 2013, Ms. Curto met with BUSA's lawyers and detailed the improper procurement of numerous contracts, BUSA's failure to maintain her confidentiality when reporting fraud, and the ongoing harassment and retaliation she had experienced as a result of investigating and reporting. Ms. Curto repeated the complaints she had lodged with Ms. Beteta, Mr. Richardson, and Mr. Klein, and provided ample documentation of the improper procurement practices she had identified.

98.     When Ms. Curto met with BUSA's lawyers, she expressed concerns about the fraudulent representations to the Federal government regarding BUSA's internal use of matching funds through its Media Partnership Agreements, as well as the inflated valuations for private-entity in-kind donations that resulted in significant misrepresentations to the Federal government. Ms. Curto also expressed concerns about the no-bid process at BUSA and the conflicts of interest between BUSA officers and directors and BUSA's contractors.

99.     After Ms. Curto's first meeting with BUSA's lawyers, Ms. Curto spoke with Mr. Klein and reiterated her concerns related to the 30% kickback scheme, as well as the over-valuated in-kind transactions. As a result, Mr. Klein scheduled another meeting between Ms. Curto and BUSA's lawyers.

100.    On or about August 28, 2013, Ms. Curto met with BUSA's lawyers for a second time, where she discussed the improper kickback payments, the improper valuations of the IMAX deal and the NYC & Company deal.

101.    During June and July of 2013, Ms. Curto was present at meetings where Board members, including Mr. Sabatini, had discussed Mr. Thompson's imminent termination and how the Corporation would message the firing of yet another CEO to Congress, the public and Corporation staff. As it turned out, however, Mr. Thompson unexpectedly managed to secure the

donations to meet the FY 2013 goal at the last minute and obtain matching Federal funds, due mainly to the $30 million IMAX deal that the Corporation had overvalued in its representations to Federal authorities.

102.    On September 30, 2013, Mr. Thompson and the marketing staff announced that the Corporation had exceeded its $100 million revenue goal. In light of this development, the Board reversed course and decided to keep Mr. Thompson instead of firing him.

103.    Within three days of reaching its revenue goal, BUSA abruptly closed its investigation of Ms. Curto's allegations.

104.    Mr. Klein sent an email to Ms. Curto on October 1, 2013, notifying her of the close of the whistleblower investigation, stating that the Corporation had found "no retaliation" and said nothing whatsoever about the merits of her underlying complaints of fraud.

105.    Two days later, on October 3, 2013, Mr. Thompson called Ms. Curto into a meeting and informed her that BUSA was terminating her "for cause," and that the Corporation would not provide her with a reference. He provided no further explanation for her termination and told her to leave the premises immediately after collecting her things. Mr. Carroll, Mr. Fridkis, and Ms. Echeverri were all terminated the same day.

## COUNT I
### Retaliation in Violation of the False Claims Act, 31 U.S.C.A. § 3730(h), as amended by the Fraud Enforcement and Recovery Act of 2009 (FERA), Pub. L. No. 111-21

106.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

107.    The 2009 amendments to the FCA found in the Fraud Enforcement Recovery Act (FERA), Pub. L. No. 111-21, § 386, 123 Stat. 1617 (2009), provide that a person violates the False Claims Act when he "knowingly presents, or causes to be presented, a false or fraudulent

claim for payment or approval." See 31 U.S.C.A. § 3729(a)(1)(A).

108.   The 2009 amendments to the FCA found in FERA provide that a person violates the False Claims Act when he knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim. See 31 U.S.C.A. § 3729(a)(1)(B).

109.   31 U.S.C.A. § 3729(b)(4) states that the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

110.   31 U.S.C.A. § 3730(h), as amended by the FERA, provides that an employee engages in protected conduct when she takes unlawful actions in furtherance of an FCA action or when she makes other efforts to stop one or more violations of the FCA. See 31 U.S.C.A. § 3730(h).

111.   BUSA cannot retaliate against an employee who engages in protected conduct under the False Claims Act, 31 U.S.C. § 3730(h), by taking lawful actions in furtherance of an FCA action, including investigation for, testimony for, or assistance in an action filed under the FCA, or by making other efforts to stop one or more violations of the FCA.

112.   An employee has engaged in protected conduct when litigation under the False Claims Act is a distinct possibility, when the conduct reasonably could lead to a viable FCA action, when litigation is a reasonable possibility, or when she makes other efforts to stop one or more violations of the FCA.

113.   An employee need not actually file a qui tam suit or even know about the protections of section 3730(h) to qualify for protection under the retaliation provision.

114.   An employee who characterizes the employer's conduct as illegal or fraudulent, or recommends that legal counsel become involved, engages in protected conduct.

115.   An employee who makes efforts to stop a false record or statement material to a

false or fraudulent claim engages in protected conduct.

116.     When an individual engages in protected conduct by making an effort to stop an

FCA violation, the act of internal reporting itself suffices as both the effort to stop an FCA

violation and the notice to the employer that the employee is engaging in protected activity.

117.     Ms. Curto discovered, documented, and reported false reports about to be made

by BUSA to the Department of Commerce and Department of Treasury.

118.     Ms. Curto engaged in protected conduct under section 3730(h) when she did so.

119.     Ms. Curto tried to stop BUSA's violations of the FCA.

120.     Ms. Curto engaged in protected conduct under section 3730(h) when she did so.

121.     Shortly after her hiring and during her employment with BUSA, Plaintiff made

repeated inquiries of officers and Board members regarding the propriety and legality of

Defendant's procurement, reporting, and certification process and methodology, including false

certifications and submission to the United States for payment of Federal matching funds under

the TPA, and made efforts to investigate and uncover same. These efforts were rebuffed by

Defendant.

122.     Specifically, Plaintiff complained about the issues with the Marketing Partnership

Agreement  (and how BUSA was obligated to spend the donated funds, as well as the 30%

match, in a pre-arranged fashion), how some of the in-kind contributions were not valued

appropriately, and the procurement policies at BUSA were not in compliance with applicable

Federal regulations (i.e., hiring and doing business with companies without a competitive bid

process).

123.     Plaintiff reported these abuses, as well as the harassment by Mr. Thompson, to the

BUSA Human Resources department, as well as Tom Klein, the head of the BUSA Audit

Committee for the BUSA Board of Directors. Plaintiff did this pursuant to the BUSA

Whistleblower Policy. As part of that process, Plaintiff met with BUSA legal counsel, and

presented her evidence of the fraud, waste and abuse (as detailed herein), and the retaliatory

efforts and actions by Mr. Thompson.

124.    By letter dated August 7, 2013, from Tom Klein, Plaintiff was informed that none

of the conduct she had complained of was "actionable."

125.    Mr. Thompson told Ms. Beteta that he planned to terminate Ms. Curto because of

her reporting.

126.    Ms. Curto reasonably believed that the reports contained false statements material

to a false or fraudulent claim.

127.    Ms. Curto reasonably believed that BUSA's false reports were capable of

influencing the payment of money to BUSA by the U.S. Department of Treasury since the false

statements in the reports would hide BUSA's kickback schemes to its donors.

128.    BUSA's employees and management knew of Ms. Curto's investigation of the

kickback scheme and her efforts to stop BUSA's false reports.

129.    Ms. Curto took lawful actions in furtherance of an FCA action by investigating

the in-kind donations and kickback schemes.

130.    Ms. Curto made efforts to stop BUSA's false statements to the Department of

Commerce.

131.    A reasonable employee in the same or similar circumstances as Ms. Curto might

believe that BUSA was possibly committing fraud against the Federal government.

132.    Because of Ms. Curto's protected conduct under the FCA, BUSA immediately

began a recurring pattern of retaliation against Ms. Curto.

133.    Because of Ms. Curto's protected conduct, BUSA falsely accused her of improper actions, tried to fire her within two months of her protected conduct, berated her without cause and fired her.

134.    BUSA would not have engaged in the recurring pattern of retaliation against Ms. Curto, and would not have made its retaliatory decision to fire Ms. Curto if Ms. Curto had not engaged in protected conduct under the FCA.

135.    Ms. Curto demands such legal or equitable relief as will effectuate the purposes of the FCA, including, but not limited to economic damages, compensatory damages, punitive damages, reasonable attorneys' fees, pre-judgment interest, court costs, and any other relief that this Court deems just and equitable.

## COUNT II
## Common Law Wrongful Termination

136.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-105 as though fully set forth herein.

137.    Plaintiff was subject to termination for attempting to correct and report unlawful actions committed by BUSA relating to procurement, reporting, and certification process and methodology, including false certifications and submission to the United States for payment of Federal matching funds under the TPA.

138.    Upon her arrival at BUSA, Ms. Curto had identified numerous violations of prohibitions of conflicts of interest in hiring and procurement policies.

139.    BUSA CEO Chris Thompson hired friends for senior-level positions without proper vetting.  Mr. Thompson also awarded contracts based on similar personal allegiances.

140.    In February of 2013, the BUSA Board of Directors advised Mr. Thompson that it

wanted an executive search firm to assist in locating and hiring a Chief Management Officer. Mr. Thompson told Ms. Curto that he intended to use a company called SearchWide because he had previously worked with SearchWide CEO Mike Gamble. He instructed Ms. Curto to post a request for proposal by executive search firms on BUSA's site, but candidly told her he planned to sign an agreement with SearchWide after the request for proposals had been posted for three days, which he ultimately did.

141.    Mr. Thompson's actions violated Federal procurement requirements and Brand USA's procurement policies. See 2 C.F.R. § 215.42 ("No employee, officer, or agent shall participate in the selection, award or administration of a contract supported by Federal funds if a real or apparent conflict of interest would be involved. Such a conflict would arise when the employee, officer, or agent, any member of his or her immediate family, his or her partner, or an organization which employs or is about to employ any of the parties indicated herein has a financial or other interest in the firm selected or an award"); id. § 215.43 ("All procurement transactions shall be conducted in a manner to provide, to the maximum extent practical, open and free competition.").

142.    To ensure open competition, BUSA developed its own internal policy, which requires that it post opportunities for a minimum of ten business days as well as a database of vendors to which it sends postings.

143.    The Government Accountability Office ("GAO") was critical in a June 2013 audit report. The GAO audit criticized BUSA for its failure to comply with procurement guidelines, specifically noting that BUSA "did not use a competitive procurement process to select the media consulting firm that assisted the corporation...in developing methodologies for valuing in-kind contributions."

144.     In May of 2013, Mr. Thompson prepared to award the Latin America Global Services Advisor contract to Spotlight, a company owned by Paula Lewis, who was romantically involved with Mr. Thompson.  Another contender for that contract approached Mr. Sabatini claiming that Ms. Lewis had the inside track for the contract due to her relationship with Mr. Thompson. Mr. Sabatini informed Ms. Curto regarding the conflict of interest related to the Latin America Global Services Advisor contract.

145.     On May 15, 2013, Ms. Curto reported what she had heard to Mr. Richardson and insisted that the Corporation could not proceed with an award unless valid procurement documentation was in place.  Ms. Beteta ultimately stepped in and informed Mr. Thompson that the Board and the industry were aware of the situation, and formally instructed him not to award the contract to Spotlight.

146.     On May 24, 2013, nine days after Ms. Curto met with Mr. Richardson, Mr. Thompson summoned her to his office and falsely accused her of improperly procuring a contract for office supplies.  In fact, this contract had been secured properly five months earlier.

147.     On June 10, 2013, in response to Mr. Thompson and Mr. Richard's false accusations relating to her contract for office supplies, Ms. Curto filed a complaint with Maureen Miller, Human Capital Services Director, documenting their retaliation for her attempts to address Mr. Thompson's violation of procedures with respect to the Latin America GSA contract.

148.     Ms. Curto refused to engage in any violations of the Federal procurement guidance or internal BUSA policies governing conflicts of interest and procurement.

149.     Ms. Curto notified BUSA leadership that the CEO was engaged in violation of Federal procurement guidance and/or internal BUSA policies governing conflicts of interest and procurement.

31

150.    Ms. Curto's failure to engage in these activities and her complaints related to the same motivated, as least in part, BUSA's decision to fire her.

151.    BUSA violated the public policy of Washington, DC.

152.    The acts committed by BUSA herein were willful, wanton, intentional, reckless and in deliberate disregard of Plaintiff's established rights.

153.    As of a result of her wrongful termination by Defendant BUSA, Plaintiff Curto has suffered, and will continue to suffer, damages, including lost wages, benefits and entitlements, damage to her career and reputation, personal humiliation, mental anguish and severe anxiety and embarrassment, justifying an award including, but not limited to, back pay, lost benefits, front pay, compensatory damages, and punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Mary Ellen Curto respectfully prays that this Honorable Court:

A.    That Plaintiff receive a jury trial on all issues so triable;

B.    That judgment be entered in favor of Plaintiff and against Defendant for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count;

C.    That judgment include, with respect to the False Claims Act, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees;

D.    Compensatory (non-economic) damages, including damages for emotional distress and loss of reputation;

E.    Non-economic damages for mental and emotional distress, embarrassment and

32

humiliation, career damages, and harm to reputation;

F.      Punitive damages to punish BUSA for malicious acts of retaliation and to deter

them for similar retaliatory conduct toward other employees;

G.      Injunctive or equitable relief, as may be appropriate, to prevent further harm to

others and the public caused by BUSA's retaliation against a whistleblower;

H.      Reasonable litigation costs, expert fees and reasonable attorneys' fees, together

with all other relief available from law and equity.

## JURY DEMAND

Plaintiff demands a trial by jury for any and all issues proper to be so tried.


October 7, 2014                                    Respectfully Submitted,



                                                   /s/ Natalie M. Koss
                                                   Natalie M. Koss, D.C. Bar No. 489551
                                                   POTOMAC LEGAL GROUP, PLLC
                                                   1420 N Street NW, Suite 102
                                                   Washington, DC 20005
                                                   (202) 643-9840
                                                   nkoss@potomaclegalgroup.com

                                                   *Attorney for Plaintiff Mary Ellen Curto*